## United States Fidelity & Guaranty Company, et al. v. Travelers Insurance Machine Company.

(Decided December 17, 1915.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

1. Appeal and Error—Bill of Exceptions—Bystanders' Bill—When Permissible.—Where, following the overruling of a motion for a new trial, entering of an order granting the unsuccessful party an appeal and allowing time for preparing and filing a bill of exceptions, the judge who presided on the trial and overruled the motion for a new trial, dies, within the time fixed for filing the bill of exceptions, the filing of a bystanders' bill is allowed by section 337, subsection 5, Civil Code, and may "be controverted and maintained pursuant to the provisions of subsections 3 and

4" thereof. It is provided by subsection 4, section 337, that "affidavits controverting an exception not filed by the judge must be filed in the clerk's office and notice of the filing given within fifteen days after the filing of such exceptions; and affidavits sustaining such exceptions must be filed within fifteen days after such notice."

2. **Appeal and Error—Bill of Exceptions—May be Made in Narrative Form.—Stenographer's Transcript of Evidence Not Indispensably Necessary.—May be Required by Trial Court.**—No particular form of exception or bill of exceptions is required, but it must state the material facts which the evidence conduced to prove. The stenographer's transcript of the evidence may properly be incorporated in the bill of exceptions, though not required. It should, however, be so incorporated by an order of the court if either party move to have it done. It is the better practice to incorporate the stenographer's transcript of the evidence in all bills of exceptions certified and attested by bystanders; and this, though not made compulsory by any provision of the Code or Statutes, the court in which the bill is filed may require, whether requested by the parties or not.

3. **Contracts—Contract for Manufacture and Delivery of Tools, Patterns and Insurance Vending Machines—Delay in Deliveries— Effect of.**—Where, by the terms of a written contract, the appellant, Noyes Mfg. Co., was to make for appellee certain tools, dies and patterns, and manufacture for and deliver to appellee 500 insurance vending machines within a given time, at a certain price per machine, payable as stipulated in the contract, the appellee to furnish metal castings for use in the cabinets containing the machines; and the appellant delayed the manufacture and delivery of the machines, not only beyond the time fixed by the contract, but also beyond the time extended therefor by a subsequent agreement of the parties; in an action brought by appellee against the appellant Noyes Mfg. Co. and its surety in a bond given for the faithful performance of the contract, such delay in deliveries cannot be excused upon the ground that it was caused by the delay of the appellee in furnishing the metal castings required for the cabinets; it appearing from the evidence that the castings could not be made or furnished by the appellee without the tools, dies and patterns which the contract required the appellant to make and deliver to the appellee; and that the delay of the latter in furnishing the castings was wholly due to that of the appellant in furnishing it the tools, dies and patterns therefor.

4. **Damages—Contract for Manufacture and Delivery of Insurance Vending Machines—Breach of—Damages Recoverable.**—It being admitted by the parties to the contract that only 132 of the 500 insurance vending machines to be manufactured by the appellant Noyes Mfg. Co. were, in fact, delivered by it to appellee, and the weight of the evidence being to the effect that the 132 machines delivered and the remaining 368 undelivered, were so defective in material and workmanship that they would not perform the

mechanical functions required of them by the contract and were, by reason thereof, worthless; neither the appellant Noyes Mfg. Co. nor its surety can complain that the jury by their verdict awarded appellee the amounts admittedly paid by it under the contract for the tools, dies, patterns and machines, aggregating $91,585.20. If there were error in the instructions as to the measure of damages, it was prejudicial to appellee, in confining the recovery to the amounts actually paid by it for the machines, etc., as stated, instead of allowing, in addition thereto, a recovery for the net profits that might reasonably have been made by appellee on the machines, if they had properly performed their work for the full year, as appellants guaranteed them to do.

5. Principal and Surety—Surety Not Released by Changes in Contract or Delay in Deliveries Provided for by the Terms of the Contract.—The surety of the Noyes Mfg. Co. cannot escape liability on the ground that by agreement between its principal and the appellee, and without its consent, there were changes made in the construction of the insurance vending machines the contract required to be manufactured and delivered by its principal to the latter, and an extension of time given for making the changes; or on the ground that it was not notified of its principal making default in the first delivery of machines required by the contract, as the extension of time and such changes as were made in the machines were contemplated by the contract and necessary in the attempt by its principal to remedy, if possible, the defects in the machines, and the delay in delivery of the machines provided for by its terms. Moreover, it was made to fully appear from the evidence that the surety was notified of the first actual default made by its principal in the performance of the contract, and of the subsequent defaults as well; also of the extension of time to enable its principal to remedy, if possible, the defects in the machines, with knowledge of all which, and in consideration of an additional premium then paid, it continued its bond in force and liability thereon for another year.

6. Trial—Instructions—What Error in Will Not Authorize a Reversal.—Although one or more of several instructions given in a case may inadequately, or even defectively, state the law intended to be set forth therein, if such inadequateness or defect is cured by another or other instructions given in the case, and the instructions as a whole state with substantial correctness all the law necessary to the proper guidance of the jury in arriving at a verdict, they will be regarded as sufficient.

Trial—Misconduct of Counsel in Argument—When Not Reversible Error.—Misconduct of counsel in argument to the jury will not constitute reversible error, if promptly rebuked by the trial court in the presence of the jury, and the latter are admonished that what was said by counsel in argument was improper and should not be considered by them as having any bearing on the case. Ordinarily, the good sense and sound discretion of the jury can be relied on to prevent injustice by reason of the incompetent

statements of counsel, when the court immediately directs that such statements are to be disregarded by them.

J. P. HOBSON & SON, WILLIAM MARSHALL BULLITT and ALEXANDER SCOTT BULLITT for appellants.

DAVID R. CASTLEMAN, MERIT O'NEAL, WILLIAM B. THOMAS and PRYOR & CASTLEMAN for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This appeal brings to us for review a judgment of the circuit court, entered upon a verdict awarding the appellee, The Travelers Insurance Machine Company, $91,585.20 damages against the appellants, Noyes Manufacturing Company and the United States Fidelity & Guaranty Company, for the alleged violation by them of a contract, the former as principal and the latter as its surety, made with appellee, August 3, 1911.

The motion of appellee, made in this court, to strike the bill of exceptions from the record will first be disposed of. The grounds urged in support of the motion are: (1) That the truth of the bill is not properly "attested by the affidavits of two bystanders," because of the failure of the bystanders to read the bill before signing the affidavits; (2) that the bill is otherwise insufficient, because it does not contain a transcript of the evidence from the stenographic notes taken thereof on the trial by the official stenographer of the court.

It is conceded by the appellee that a "bystanders'" bill of exceptions was necessary in this case, owing to the death of the judge, W. M. Smith, who presided at the trial, and such bill is expressly allowed by section 337, sub-section 5, Civil Code, which provides:

"If the judge who presided at the trial does not preside when a motion for a new trial (or has been) overruled, the bill of exceptions may be certified by bystanders, and be controverted and maintained, pursuant to the provisions of subsections 3 and 4 of this section."

Sub-section 3 provides:

"If the bill of exceptions be approved by the judge he shall sign it, and it shall be filed as part of the record, but not spread at large on the order book. If not approved, he shall correct it, or suggest the correction to be made, and sign it. A party objecting to the judge's correction of an exception which purports to state the evidence may, within five days after the bill is signed,

file the exception as written by him, if its truth be attested by the affidavits of two bystanders; but its truth may be controverted and maintained by other affidavits filed in the clerk's office, not exceeding five on either side.''

By sub-section 4 it is provided:

''Affidavits controverting an exception not signed by the judge must be filed in the clerk's office, and notice of the filing given, within fifteen days after the filing of such exceptions; and affidavits sustaining such exception must be filed within fifteen days after such notice.''

It appears from the record that the trial of this case in the court below began May 11, and ended May 21, 1914, and that a motion for a new trial was made by each of the defendants within three days after the conclusion of the trial. The motions for a new trial were overruled August 7th, 1914, and sixty days' time for filing a bill of exceptions was given, by an order then entered, which carried the time for filing the bill to October 6, 1914. Judge Smith, who had presided at the trial and overruled the motions for a new trial, died September 3, 1914, and on September 21, 1914, Judge Charles T. Ray qualified as his successor. On October 1, 1914, five days before the expiration of the sixty days' time allowed by the order of August 7th for filing the bill of exceptions, an order was entered by Judge Ray granting the appellants sixty days additional time within which to prepare and tender their bill of exceptions, which extended the time for filing the bill to December 3, 1914. It is conceded by appellee that this extention of time for filing the bill of exceptions was permissible under the practice obtaining in courts of continuous session, like that of the Jefferson Circuit Court.

On October 5, 1914, which was the day before the expiration of the sixty days first allowed for filing the bill of exceptions, the appellants tendered and moved to file the ''bystanders' '' bill of exceptions appearing in the record, ''certified to by bystanders and the truth thereof attested by the affidavit of such bystanders.'' The court thereupon ordered it marked ''tendered'' and took under submission the question whether it should be filed. Instead of being certified and attested by the affidavits of two bystanders, as required by section 337, subsection 3, Civil Code, this bill was certified and its truth attested by the affidavits of five bystanders, viz.: John

W. Ware, official stenographer of the court; N. B. Wigginton, foreman of the jury by which the verdict was returned; Morse English, clerk of the court; T. C. Duddy, a deputy sheriff acting for the court during the trial, and C. C. Smith, a law clerk in the office of appellants' counsel.

The bystanders' bill of exceptions so tendered on October 5th purported to contain within itself, and not by any reference or direction to "insert," all the evidence, exhibits, instructions and exceptions, and declares that it "contains all the evidence which was heard, read or considered on the trial of this case, and all the exceptions taken by each of the defendants on the trial of the case, and all of the instructions asked, given or refused, which bill of exceptions is true;" and after stating the death of Judge Smith and the necessity for preparing the bill in the form presented, ended with the declaration that the appellants "have had this bill of exceptions certified by and the truth attested by the affidavits of five bystanders, to-wit: (naming them)." As thus prepared the bill was signed by the five bystanders, who made oath that they "do certify to and attest the truth of the foregoing exceptions and do depose and say that the foregoing bill of exceptions is true and that the statements therein contained are true."·

October 9, 1914, appellee moved to strike the tendered bill from the record and in support of the motion filed affidavits from four of the bystanders who had sworn to the bill. These affidavits failed to dispute the correctness of the bill in any particular, but did state that the affiants had signed and sworn to it without reading it in full. In the meantime, and before ordering the bill to be filed, Judge Ray discovered that his predecessor, Judge Smith, had failed to sign the judgment entered on the verdict or the order overruling the motion for a new trial; also, that he had not signed any of his orders and judgments for as much as a year before his death. After communicating this information to the counsel representing the parties to this action, Judge Ray, on October 16th, under the authority of section 977, Kentucky Statutes, signed and dated all of Judge Smith's unsigned orders, including the judgment and orders in this case; and, on the same day, overruled appellee's motion to strike appellants' bill of exceptions from the record and ordered the tendered bill to be filed and made

a part of the record, and it was so filed with the same effect as if it had been filed October 5, 1914, when first tendered.

Because of the previous filing of the affidavits by appellee, for the purpose of showing that the bill of exceptions had not been read to or by the bystanders by whom it was certified and its truth attested, appellants, on October 28th (which was still within the extension of time given for filing their bill), filed the affidavits of D. L. Linville, C. C. Tharpe, C. W. Dale, B. H. Noyes and Jno. W. Ware. Linville and Tharpe were members of the jury that tried the case, Dale and Noyes bystanders and Ware the official stenographer. These affidavits show that the affiants named were present throughout the trial; that they had read the bill of exceptions; that the statements therein contained were true, and that they did "certify to and attest the truth of the said bill of exceptions which is a true bill of exceptions."

It is, however, insisted for appellee that Noyes was incompetent to attest the bill as a bystander because of his connection with the appellant, Noyes Manufacturing Company, and interested in the subject matter of the action; and that C. C. Smith, one of the original five persons who attested the bill was incompetent because associated with appellants' counsel in the trial of the case. Conceding this to be true, though but two were required, there are still left four of the five bystanders who certified and attested the truth of the bill before it was tendered, and four of those making the affidavits last filed certifying and atttesting the truth of the bill, the last four stating that they had read the bill of excepions. So, if it were further conceded that inquiry can now be made as to whether the first bystanders read or had read to them the bill before certifying and attesting its truth, the fact that it was read by Linville, Tharpe, Dale and Ware before being certified and its truth attested by them, and that their affidavits, showing that fact, were filed within the extension of time allowed by the court for preparing and filing the bill of exceptions, makes it apparent that the bill must be regarded as having been duly certified and its truth attested by bystanders in the meaning of the Code.

After the filing of the affidavits last mentioned, appellee filed an affidavit which controverted the bystand-

ers' bill, by pointing out a few alleged errors.  Appellants in turn filed other affidavits dealing specifically with the errors referred to in appellee's affidavit, some of which were admitted and corrected and others disproved.  The filing of the last mentioned affidavits by appellee and appellants was allowed by section 337, subsection 5, of the Code.  It is our conclusion that the bill of exceptions was duly certified and its truth properly attested by bystanders, as allowed by section 337, subsection 5, Civil Code.

It now remains to be determined whether appellants had the right to prepare their bill of exceptions in narrative form and without its containing a transcript of the evidence from the notes of the official stenographer, made and taken on the trial by order of the court.  We have been referred to no decision of this court holding that the old-time narrative form of a bill of exceptions can no longer be used.  Under the old practice they were made up in narrative form and noted of record as the trial progressed, signed by the judge and numbered or otherwise properly identified.  Later they were made up at the close of the trial, or in any event, before the end of the term, while the memory of both court and counsel was fresh.  Then came the practice of taking until a day certain in the succeeding term to prepare and file the bill of exceptions, which grew out of the practice of having unofficial stenographic reports of the evidence, which were used in making up the bill of exceptions and could not ordinarily be transcribed by the reporter during the term at which the trial was had; but the transcript when made had to be copied by the clerk in the record for the appeal.  Finally, to avoid the unnecessary cost incurred by having the clerk to copy the transcript made by the stenographer, section 1019a and sections 4637-4645, Kentucky Statutes, were enacted, to enable the stenographer's transcript, when properly made a part of the bill of exceptions, to be taken direct to the Court of Appeals, without being copied by the clerk.  Under Kentucky Statutes, section 4639, the trial court will, upon motion of either party, order the transcript of evidence written out and filed, but it seems to be purely optional with the parties whether they will request it or not.

There is not, as argued by counsel for appellee, any provision of the stenographer's acts which has so re-

pealed or amended the code provisions as to bills of exceptions as to make it the imperative duty of an appellant to include the stenographer's transcript in his bill. On the contrary, it is only provided that it may be incorporated in the bill of exceptions, and if so incorporated, he may avail himself of the right to save cost by having it attested without being copied. Civil Code, section 337, imposes upon the losing party the duty of preparing the bill of exceptions, and in this preparation he may use the official stenographer's report. Section 4644, Kentucky Statutes; Louisville Home Tel. Co. v. City of Louisville, 130 Ky., 659.

In Jenkins v. L. & N. R. Co., 105 Ky., 737, we held that the fact that the trial court ordered the reporter to take the testimony, did not impose on the reporter any obligation to write out and file the transcript, but that this might be required by the court after the trial, on motion of one of the parties. Also, in Albin v. Louisville Ry. Co., 114 Ky., 982, it was held that where the official transcript was written out by the direction of the ultimately successful party, but without having first obtained an order from the court for the transcript, it is merely a matter of private convenience, the cost of which is not taxable against the losing party. In other words, the matter of making a transcript of evidence is to be done by order of the court. It is manifest that these two cases overthrow appellee's theory that when the court orders a case reported it carries with it the requirement that a transcript of the evidence so reported must necessarily be written out and filed. Southern Ry. Co. v. Thurman, 25 R., 804; I. C. R. Co. v. Howard, 27 R., 513; Knecht v. Louisville Home Tel. Co., 121 Ky., 492.

Civil Code, section 335, sub-section 1, provides:

"No particular form of exception, or bill of exceptions, is required. A party must not, except as hereinafter provided, state the evidence, but must state the material facts which the evidence conduced to prove; and, if the exception be to a decision admitting or excluding testimony, or concerning its meaning or effect, so much of the evidence as is necessary to explain the exception, and no more, shall be stated."

Sub-section 2 provides:

"If the judge refuses to sign the bill of exceptions, as presented; or, if the party wish to appeal upon the ground that the verdict is not sustained by the evidence,

it shall be stated in full, and the bill of exceptions be presented to the judge.''

It is manifest from the foregoing provisions of the Code that in many cases it is not only unnecessary but actually improper to include a complete transcript of the evidence, although it is generally done where the inclusion of any part of it is necessary, simply because counsel wish to save themselves the labor of condensing the bill. In Postal Tel. Co. v. Cotton Oil Co., 136 Ky., 843, we said:

"Under the old system and before the advent of the official stenographer it was the practice for attorneys *to write out a bill of exceptions containing the substance of what the witnesses said* and the exceptions and objections thereto. * * * Occasionally a bill is made up in this way now, although with few exceptions, the oral evidence is taken down by the official stenographer, who makes out a transcript for use in this court, as provided in section 4639 of the Kentucky Statutes."

While conceding that the old system of making out bills of exceptions is not generally followed now, yet in admitting that "occasionally a bill is made up in this way now," the opinion recognizes the legal right of the appellant to make up his bill in the old narrative form, and also that it is still sometimes done in that way. The case of Providence Savings Co. v. Wayne, 131 Ky., 84, is one in which, though two weeks were required to hear the evidence and complete the trial, the narrative form adopted in placing the evidence in the record lessened its size to more than half of what it would have been had the stenographer's transcript been used.

In none of the cases cited by appellee's counsel is there an intimation that the stenographer's transcript of evidence *must* be included in the bill of exceptions. The bill of exceptions must, of course, include the evidence, but that can be done either by incorporating the official transcript of it made by the stenographer, or by stating the substance of the evidence completely in narrative form.

If appellee had desired a full transcript of evidence as made by the stenographer incorporated in the bill of exceptions, it could have required it to be done by motion to that effect, which it would have been the duty of the trial court to sustain; but it evidently did not care to take this step, or, at any rate, did not do so, and

hence it has no ground for complaint. It is true appellants, at their own expense and as a matter of convenience, had the transcript written out, to assist them in their preparation of the bill of exceptions, but it was done without an order of the court and was a matter over which the court had no control whatsoever. It is not to be overlooked that when the appellants, October 1st, moved to require the official stenographer to make out and file the transcript, appellee objected to the motion and excepted to the ruling of the court sustaining it. Therefore, the fact that the order was later set aside gives it no ground for complaint.

We regard it the better practice to incorporate the stenographer's transcript of the evidence in all bills of exceptions, certified and attested by bystanders; and this, though not made compulsory by any provision of the Code or Statutes, the court in which the bill is filed should require, whether requested by the parties or not.

As in our opinion the bill of exceptions is complete and sufficient in the form presented, the motion of appellee to strike it from the record is overruled.

The appellee corporation was organized in 1909, under articles of incorporation authorizing it to engage in the business of constructing and operating machines that will automatically vend accident insurance. Other accident insurance companies have a five thousand dollar policy, good for twenty-four hours, which is sold for them by railroad ticket agents at twenty-five cents. Appellee proposed to sell by means of its automatic machines a policy similar in terms, but for one thousand dollars, good for twenty-four hours, at five cents, the machines to be maintained in railroad stations, hotels, saloons and other public places. The original model of the machine intended to be used by appellee in its business was designed for it by one Edmund S. Church, an inventor formerly in the employ of the National Cash Register Company, at Dayton, Ohio. The model or original machine was constructed by Church for the most part in the shops of the All-Ed Machine Company, at Dayton, which later changed its name to the Noyes Manufacturing Company, one of the appellants herein.

Following the construction of the model mentioned, twelve second like models were built for appellee by the appellant, Noyes Manufacturing Company, which it was thought retained the principles and at the same

time improved the efficiency of the original. These twelve models are frequently mentioned in the record as the "model machines." Their gear or cog wheels were constructed entirely of steel and being hand-made were more expensive than the commercial method of manufacture at first contemplated by appellee and the Noyes Manufacturing Company. Upon the completion of these twelve model machines, about May 1, 1911, seven of them were shipped to the city of Boston and there placed in railway stations, where they were kept in public operation, under close inspection, for about six weeks, for the purpose of testing their mechanical and commercial value. The receipts realized from their operation averaged about sixty cents per day. It soon developed from the use thus made of the machines that several improvements and required changes in their mechanism would be necessary, all of which was well known to and understood by the appellant, Noyes Manufacturing Company.

Following the testing of the model machines, appellee began to make its plans for the distribution of a large number of them, and to this end determined to immediately manufacture five hundred of the machines, which the appellant, Noyes Manufacturing Company, agreed to construct for it in such a manner as that it would guarantee their efficiency. Pursuant to this agreement, appellee on August 3, 1911, entered into the following written contract with the Noyes Manufacturing Company:

"This contract made and entered into by and between The Noyes Manufacturing Company, of Dayton, Ohio, party of the first part, and The Travelers Insurance Machine Company, of Phoenix, Arizona, party of the second part.

"Witnesseth; That whereas, the party of the second part is desirous of having manufactured five hundred (500) automatic insurance vending machines of the design, style and mechanism of certain models of said machine now owned by second party and with which all parties hereto are familiar and a technical description of which is contained in the detailed drawings or blue-prints attached hereto and made a part hereof numbered respectively from 1 to ——, and said second party is also desirous of having manufactured the tools, dies, jigs, patterns, etc., needful or useful in the con-

struction of said machines and an itemized list of which is hereto attached and made a part hereof marked Exhibits No. 1 to No. 414.

"Now said party of the first part agrees and promises to furnish all material and manufacture said tools, dies, jigs, patterns, etc., and said five hundred (500) machines under the following conditions:

"*First.* It will manufacture said tools, dies, jigs and patterns necessary to the complete construction of said insurance vending machines whether specifically itemized in the aforesaid lists or not, and will deliver same to second party complete and ready to use, free from defects of workmanship or material for the total sum of $24,085.20.

"*Second.* It warrants that said tools, etc., will be sufficiently durable to perform the work required of them in the construction of four thousand (4,000) of said insurance vending machines, if used in a workmanlike manner.

"*Third.* It is understood that the itemized lists of tools, dies, jigs, and patterns heretofore referred to was prepared by first party and it is thought that same contains all of the tools, dies, jigs and patterns necessary for the construction of said machines, but in the event it does not and other tools, dies, jigs, and patterns are required for the successful and complete construction of said machines, then first party agrees to make such other tools, dies, jigs, and patterns without any additional charge therefor against second party; it being the purpose of this agreement and the intention of the parties to secure the manufacture of a complete set of tools, dies, jigs, and patterns in every detail necessary for the construction of said machines for the said price of $24,085.20.

"*Fourth.* First party agrees to furnish second party in writing, a description of each of said tools, dies, jigs, and patterns as same is completed and to deliver to second party all or any of said tools, dies, jigs and patterns upon demand at any time after five hundred (500) of said insurance vending machines have been completed and delivered, and further agrees to keep said tools, dies, jigs and patterns in good condition and to take all reasonable precaution to protect same against damage

so long as same may be in its possession or under its control.

"*Fifth.* First party further agrees to manufacture 500 of said insurance vending machines for the price of $134.50 each, f. o. b. Dayton, Ohio—total contract price for 500 machines, $67,250.00—second party to furnish first party the castings for the cabinets of said 500 machines free of charge in accordance with the provisions of the next paragraph.

"*Sixth.* The castings for the cases or cabinets of said 500 machines consisting of parts referred to in the blue prints hereto attached marked ―― shall be delivered by second party to first party at its factory in Dayton, Ohio, free of charge as follows: Castings complete for fifty cabinets on or before October 7, 1911, and the castings for the remaining 450 cabinets at the rate of fifty every two weeks thereafter. All of said castings shall be executed in as workmanlike manner as those now in the model machine in second party's office subject to first party's inspection on delivery. The guaranty given by the first party shall not cover defects in any of said castings.

"*Seventh.* First party warrants that each of said machines shall be constructed in a skillful and substantial manner and shall be free from defects of material or workmanship of any kind, and that each of said machines will perform the mechanical functions for which it is designed; namely, will automatically stamp the time of day and day of year upon an accident insurance ticket and coupon, upon the purchaser thereof standing upon the platform of said machine, and depositing therein a five-cent coin and will indicate the proximate weight of said purchaser; and that said machines will perform said operations in public use for a period of one year after same are inspected and passed upon by an agent of the party of the second part, and delivered to second party; it being understood that if said machines are damaged by the carrier of said machine to its place of destination, that party of the first part shall not be held for such damages, or if by rough or unfair treatment said machines are damaged or fail to work, then the party of second part must pay the cost of repairing such damage to machine. It is understood by the parties to this contract that second party's requirements in the

construction of said machines, demand that same be so mechanically perfect and so substantially manufactured that same will be suitable to place in public places for public use for the purpose of selling through them accident insurance policies to the public and indicating to each purchaser thereof his approximate weight, and where any technicalities or specifications appear in this contract or as part thereof in the exhibits, same shall be construed in the light of said intention of the parties with the view of obtaining the construction and delivery to second party of said 500 machines complete in every detail for said price of $134.50 per machine.

"*Eighth.* Each of said machines shall be painted and ornamented and have substantially the same external appearance as the model machine in the office of second party, a photograph of which is hereto attached, marked Exhibit 'A,' provided, however, that the party of the second part, may, without additional cost or expense, change the color of the paint used on any of said machines, and the lettering and instructions appearing thereon, provided it gives to the first party two weeks' notice of said desired change and reimburses it for expense already incurred, if any.

"*Ninth.* First party agrees that the mechanism of each of said machines shall be so treated by nickel-white process, or other recognized scientific process, as will make them as near non-rustible and impervious to the action of salt water atmosphere or other weather or climatic conditions as possible.

"*Tenth.* First party agrees to deliver the first of said machines to second party, packed and crated ready for shipment f. o. b. Dayton, Ohio, on or before the expiration of seven months from date of the signing of this agreement, and to deliver in like manner thereafter: One machine each working day during the first month, two machines each working day during the second month, three machines each working day during the third month, four machines each working day during the fourth month, and the remainder at the rate of five machines each working day thereafter until all 500 are delivered, and if for any reason it fails to do so, then it agrees to pay second party as liquidated damages, the sum of ten cents per day for each machine it fails to so deliver, said payments to continue until all of said machines have been duly delivered in accordance with

·the conditions of this contract—it being understood between the parties that the time of said delivery is of great importance to second party and has vitally entered into this agreement as part of its consideration and as one of the inducements to second party to pay first party the price per machine as set out above.

"Now, in consideration of the above conditions, agreements and undertakings and each of them, the second party agrees and promises as follows:

"*Eleventh.* It will pay to first party the sum of $15,355.20 upon the execution, signing and delivery of this contract by the respective parties and the execution by first party of a satisfactory bond with sufficient surety thereon for its faithful performance of its agreements herein, which said sum shall be in part payment of the total sums due first party under this contract and second party shall be given due credit thereof accordingly.

"*Twelfth.* Second party shall pay the balance of moneys due first party under this contract, to-wit, $76,000.00, as follows: $7,000.00 on the first days of September, October, November, December, 1911, and January, February, March, April, May, June, 1912, and when all 500 machines and said tools, etc., are delivered in accordance with the terms of this contract, it will pay the balance of said contract price due first party, to-wit: $6,000.00, subject to such deductions and set-offs as second party may be entitled to by reason of the failure, if any, of the first party to construct and deliver said · machines and tools, etc., or any of them, in the manner hereinabove set out.

"*Thirteenth.* It is further agreed and understood that the party of the second part shall at all times during the progress of any work under this agreement, have the right of visitation by any of its officers, or authorized agent, at first party's factory, and said officers or agents, may advise and consult with first party concerning the construction of said machines, and may there engage in experimental work in connection with said machines. without any charge by the first party therefor, provided, however, that it shall be optional with first party whether it will adopt any advice or suggestion of second party's officers or agents, in the performance of this contract, and it is expressly understood that any adoption of any such advice or suggestion shall not release

first party from its obligation to deliver perfect machines as provided in the other clauses of this contract. And it is further understood that the adoption of such advice or suggestion in construction shall not place any additional cost or charge against second party unless the same is expressly authorized in writing signed by a majority of the Executive Committee of second party's Board of Directors, it being the purpose of this clause to merely enable first party to have the consultation of such of second party's agents as it may designate during the progress of this contract with the view of attaining the highest degree of perfection and efficiency which can be developed in the machine without changing the cost thereof as heretofore agreed upon, or the obligation of first party to deliver perfect machines under the conditions as expressed in other paragraphs of this contract. It is also agreed that any improvements developed in the design or mechanism of said machine by first party may be adopted by second party at its option without charge.

"*Fourteenth.* It is further understood that after finished machines have been inspected, passed upon and accepted by party of the second part or its agents, that all costs of adjustments and looking after said machines shall be taken care of by party of the second part.

"*Fifteenth.* It is agreed that first party will execute guaranty bond with a satisfactory guarantor thereon, guaranteeing its full and faithful performance of its undertaking hereunder.

"*Sixteenth.* The second party grants the privilege to the first party to place upon the front of machines in such position as they may hereafter agree upon a small plate or 'transfer' containing substantially the words, 'These machines built by the Noyes Manufacturing Co., Dayton, Ohio.'

"*Seventeenth.* The clocks, locks, steel, and other material used by first party shall be of at least as good quality as that used in the construction of the twelve model machines and specified by the blue prints, and the machines shall contain the 'lock-out' and 'coin-return from policy slot' attachments which are now being placed upon the model machines.

"*Eighteenth.* It is further agreed and understood that in the event work under this contract is suspended

by first party continuously for as long as one week on account of fire, casualty or other cause, that then the monthly installment payments by second party provided by the twelfth clause thereof, shall be postponed for a corresponding period of time.

"IN TESTIMONY WHEREOF, the parties hereto have, by authority of their respective Boards of Directors, executed and signed this, the foregoing agreement in duplicate, by their respective officers and attached their respective corporate seals this third day of August, at Louisville, Kentucky. The blue prints mentioned herein not being completed same shall be attached and numbered as exhibits when prepared.

"THE NOYES MANUFACTURING COMPANY,
    "By Benj. H. Noyes, Genl. Mgr.
"THE TRAVELERS INSURANCE MACHINE COMPANY,
        "By S. T. Castleman, President.
        "B. N. McGraw, Secretary."

On the eighth day of August, 1911, the appellant, Noyes Manufacturing Company, together with the appellant, United States Fidelity & Guaranty Company, as its surety, executed to appellee a bond in the sum of $100,000.00 for the faithful performance of its contract with it, as required by clause fifteen thereof, which bond, omitting the formal part, contained in the first paragraph, is in the following words and figures, to-wit:

"WHEREAS, said Principal has entered into a certain written contract with the Obligee, dated the third day of August, 1911, to manufacture and deliver for the said Obligee tools, dies, jigs, patterns, etc., and 500 vending machines, in accordance with the terms and conditions of said contract which is made a part hereof as fully and to the same extent as though set forth at length herein:

"Now, Therefore, The condition of the foregoing obligation is such that if the said Principal shall well and truly indemnify and save harmles the said Obligee from any pecuniary loss resulting from the breach of any of the terms, covenants and conditions of the said contract on the part of the said Principal to be performed, then this obligation shall be void; otherwise to remain in full force and effect in law: *Provided*, how-

ever, that this bond is issued subject to the following conditions and provisions:

"*First.* That no liability shall attach to the Surety hereunder unless, in the event of any default on the part of the Principal in the performance of any of the terms, covenants or conditions of the said contract, the Obligee shall promptly, and in any event not later than thirty days after knowledge of such default, deliver to the Surety at its office in the City of Baltimore, written notice thereof with a statement of the principal facts showing such default and the date thereof; nor unless the said Obligee shall deliver written notice to the Surety at its office aforesaid, and the consent of the Surety thereto, obtained, before making to the Principal the final payment provided for under the contract herein referred to.

"*Second.* That in case of such default on the part of the Principal, the Surety shall have the right, if it so desire, to assume and complete or procure the completion of said contract; and in case of such default, the Surety shall be subrogated and entitled to all the rights and properties of the Principal arising out of the said contracts and otherwise, including all securities and indemnities theretofore received by the Obligee, and all deferred payments, retained percentages and credits, due to the Principal at the time of such default, or to become due thereafter by the terms and dates of the contract.

"*Third.* That in no event shall the Surety be liable for a greater sum than the penalty of this bond, or subject to any suit, action or other proceeding thereon that is instituted later than the eighth day of August, A. D., 1912.

"*Fourth.* That in no event shall the Surety be liable for any damages resulting from, or for the construction or repair of any work damaged or destroyed by an act of God, or the public enemies, or mobs, or riots, or civil commotion, or by employes leaving the work being done under said contract, on account of so-called 'strikes' or labor difficulties.

"In testimony whereof, the said Principal has caused these presents to be sealed with its corporate seal, attested by the signature of its duly authorized officers, and the said Surety has caused these presents to be sealed with its corporate seal, duly attested by the signa-

tures of its vice president and its assistant secretary, the day and year first above written.

"Signed, sealed and delivered in the presence of M. A. Murphy, Edna V. Euchenhoper.

"The Noyes Manufacturing Company, Of Dayton, Ohio.

"By Benj. H. Noyes, General Manager.

"The United States Fidelity and Guaranty Company.

(Seal)                                    "Alexander Paysons Knapp,

Attest:                                                        "Vice President.

"Wm. T. Morgan, Assistant Secretary."

This action was instituted by the appellee October 4, 1913, on the bond executed to it by the appellants, to recover damages for an alleged breach of the contract made with it by the appellant, Noyes Manufacturing Company, in the following particulars: That the Noyes Manufacturing Company failed to manufacture for appellee the tools, dies, jigs and patterns necessary to the complete construction of the insurance vending machines or to deliver same to appellee complete or ready for use, free of defects of workmanship or material, or at all, although appellee had paid it therefor a sum in excess of the $24,085.20 required by the contract. That the appellant, Noyes Manufacturing Company, also failed to furnish appellee in writing or at all a description of the tools, dies, jigs or patterns as completed, or any of them. That the appellant, Noyes Manufacturing Company, also failed to manufacture or deliver to appellee five hundred or any insurance vending machines, free from defects of workmanship or material, or that would perform the mechanical functions for which the machines were designed, or automatically stamp the time of day or day of year upon any accident insurance ticket or coupon, upon the purchaser thereof standing upon the platform of such machine and depositing therein a five-cent coin, or indicate the approximate weight of such purchaser; and, further, that such machines as were manufactured and delivered to appellee by the appellant, Noyes Manufacturing Company, in the attempted execution of its contract were defective in material and workmanship and did not perform the mechanical functions for which they were designed or perform such functions for a period of one year or any length of time. That the appellant, Noyes Manufacturing Company, only delivered to appellee two machines April 8, 1912; eight May 15,

1912; five May 27, 1912; fifteen July 3, 1912; fifteen August 15, 1912; twenty August 16, 1912; three August 23, 1912; fourteen October 11, 1912; two November 25, 1912; fifty November 29, 1912, making altogether one hundred and thirty-two machines, none of which were constructed in the manner provided by the contract or would perform the mechanical functions in public use for which they were designed. That the one hundred and thirty-two machines proved to be utterly worthless and were not accepted by appellee, but were offered to be returned and tendered by it to the appellant, Noyes Manufacturing Company, which refused to receive or accept them.

It was further alleged in the petition that in addition to damages amounting to $40,000.00 resulting to appellee by reason of the loss of profits from the failure of the appellant, Noyes Manufacturing Company, to comply with its contract, it paid to the latter upon the signing of the contract between them, and as required by its terms, $15,335.20, and thereafter the sum of $70,000.00, in ten monthly installments of $7,000.00 each, beginning September 1, 1911, the various payments mentioned aggregating $85,335.20, for which it received nothing of value from the appellant, Noyes Manufacturing Company whereby appellee was damaged in the sum of $85,335.20. That in addition it paid out for expenses of freight, travel, labor and material in efforts to operate the machines delivered it by the appellant, Noyes Manufacturing Company, $3,000.00, an itemized account of which was filed with the petition. That it did not pay to the appellant, Noyes Manufacturing Company, the $6,000.00 contemplated by the twelfth clause of the contract betwen them, because it is more than offset and cancelled by the claims of appellee against the Noyes Manufacturing Company. By the prayer of the petition judgment was asked against appellants, Noyes Manufacturing Company and the United States Fidelity & Guaranty Company, for $100,000.00 damages, the amount of the bond, and appellee's costs.

Appellee filed an amended petition in which it was, in substance, alleged that the character, design and construction of the insurance vending machines, tools and patterns that were to be furnished appellee by the appellant, Noyes Manufacturing Company, were such that they could not be purchased in any market and had to be

specially manufactured, according to certain models and patents owned by appellee, and as provided by the appellant, Noyes. Manufacturing Company's, contract with it; and that by reason of the failure of the appellant, Noyes Manufacturing Company, to manufacture and deliver the machines, tools, patterns, etc., mentioned, appellee was. damaged, in addition to the amounts set out in the original petition, in the further sum of $50,000.00; that at the time the contract between appellee and the appellants was made it was well known to the latter that appellee's purpose in obtaining the manufacture and delivery to it of the machines in question was to sell accident insurance to the public through them, by distributing them in different cities, at various public places, such as hotels, railroad depots, cafes, barber shops, etc.; and that as a part of such plan it was intended to obtain the privileges of so locating such machines from the owners of such establishments by paying them a commission upon the receipts of such machines; and also that appellee would enter into contracts with insurance companies and others, whereby it would lease the machines for operation and would be compensated for the use of same by a certain royalty or percentage of the receipts thereof; and, that with the knowledge of appellants it entered into a contract with the Ben Hur Casualty Company, an Indiana insurance corporation, whereby the latter company leased the five hundred machines and agreed to take charge of, locate and operate same as and when they were delivered to appellee by appellant, Noyes Manufacturing Company, and to place insurance policies therein, to pay all charges and expense in connection with the operation of the machines, and to pay appellee fifty per cent of the gross receipts thereof as compensation for their use.

It was further alleged in the amended petition that by virtue of its contract with the appellants, appellee turned over to the Ben Hur Casualty Company a number of the machines manufactured by the appellant, Noyes Manufacturing Company, and the Ben Hur Casualty Company placed same for public operation, for as much as four months, in various places in the state of Indiana, at Evansville, Indianapolis, Terra Haute, Ft. Wayne and Crawfordsville, and entered into contracts with various owners of the premises upon which the machines were located; but that by the failure

of the machines to perform the mechanical functions for which they were designed and because of their defective manufacture, material and workmanship, as set out in the petition, the machines would not operate and failed to deliver to patrons policies for their five-cent coins dropped therein, consequently, the various persons in whose places the machines were located, refused to permit them to remain and required them to be taken out; and, that the Ben Hur Casualty Company, on account of such failure of the machines to operate, returned them to appellee and compelled the cancellation of the contract under which appellee had furnished it the machines. That thereafter appellee on its own account purchased insurance policies suitable for automatic sale by means of the machines in question and attempted to operate the machines in public places in the cities of Cincinnati, Ohio, Newport and Covington, Kentucky, and other places, but that they would not perform the mechanical functions required by the contract it made with appellants, and on this account the owners of the places in which they were located would not permit them to remain. That by reason of the failure of the machines to operate and from the breaches of its contract with appellants thereby resulting, the reputation of appellee and its business of selling accident insurance through its automatic vending machines was rendered difficult, expensive, and, in fact, impossible, whereby appellee was damaged in the sum of $50,000.00.

The appellants filed separate answers, that of the Noyes Manufacturing Company being made a counterclaim. Its first paragraph traversed the averments of the petition as amended. In the second paragraph it was alleged that by its contract with appellee the latter obligated itself to cause to be made and delivered to the appellant, Noyes Manufacturing Company, at its factory in Dayton, Ohio, castings complete for the five hundred insurance vending machines the latter was to manufacture for it, that is, the heavy metal outside portions of the machines, as distinguished from interior machinery, such deliveries of castings to be made in lots sufficient for fifty cabinets each, as of the following dates: October 7, 1911; October 21, 1911; November 4, 1911; November 18, 1911; December 2, 1911; December 6, 1911; December 30, 1911; January 13, 1912; January 27, 1912; February 10, 1912. That appellee did not deliver to the

appellant, Noyes Manufacturing Company, any of such castings upon any of the dates specified, but each delivery thereof was made by it after the time required by the contract between the parties; that by reason of the delay in the delivery of the castings the appellant, Noyes Manufacturing Company, was in turn compelled to delay the manufacture and delivery of the machines to appellee; and, that the latter, by reason of its own delay in the delivery of the castings, is estopped to complain of the failure of appellent to deliver the machines within the time required by the contract.

In paragraph 3 it was alleged that by mutual agreement between appellee and the appellant, Noyes Manufacturing Company, the times specified in the contract between them for the delivery by the latter of the machines constructed under the contract were changed, waived and extended to such reasonable time as it might be able to complete the machines with reasonable dispatch and thereafter deliver them on demand when required by appellee, with which agreement, it was alleged, the appellant, Noyes Manufacturing Company, complied.

In paragraph 4 it was alleged that the appellant, Noyes Manufacturing Company, was further delayed in the completion and delivery of the machines, by reason of numerous changes which appellee required to be made in the machines from the method of construction prescribed by the contract.

In paragraph 5 it was alleged that in addition to delivering to appellee the 132 machines the latter admits it received, the appellant, Noyes Manufacturing Company, completed the remaining 368 machines as specified in the contract and had them packed and crated, ready for shipment, as required therein, and tendered delivery thereof to appellee, but that the latter refused to accept them; and, that if appellee sustained any damage by reason of the non-delivery of any of the machines, which was denied, such damage is limited to ten cents per day for each machine it failed to so deliver, as provided by clause 10 of the contract of August 3, 1911.

In paragraph 6 it was alleged that the appellant, Noyes Manufacturing Company, manufactured all the tools, dies, jigs and patterns necessary to the complete construction of the insurance vending machines, and also the five hundred machines, as required by the con-

tract, and that appellee had paid it of the purchase price, $85,335.20, but had not paid it the remaining $6,000.00, nor any part thereof, nor any interest thereon, as provided by the contract, although such payment had been demanded of it. That after some of the machines were finished by it and accepted by appellee, many of them were damaged and failed to work by reason of rough and unfair treatment on the part of the latter; and that in repairing the injuries so caused such machines appellant furnished material, time and labor and incurred expense amounting to $607.26, which, by the terms of the contract, appellee was required to pay it, but has not paid. For this amount, $607.26, and the $6,000.00, alleged balance due on the contract price for the five hundred machines, judgment was asked against appellee.

The answer of the appellant, United States Fidelity & Guaranty Company, consists of two paragraphs; the first containing a traverse, the second alleging, first, that in the bond sued upon it was agreed between appellee and the appellant, United States Fidelity & Guaranty Company, that in the event of any default on the part of the Noyes Manufacturing Company in the performance of any of the terms of its contract with appellee, no liability should attach to the appellant, United States Fidelity & Guaranty Company unless appellee should promptly and, in any event, not later than thirty days after knowledge of such default, deliver to it at its office in the city of Baltimore, written notice thereof, with a statement of the principal facts showing default and the dates thereof. That appellee did not promptly or within thirty days after knowledge of the alleged default on the part of the Noyes Manufacturing Company, deliver to the appellant, United States Fidelity & Guaranty Company, at its office in the city of Baltimore, written notice with a statement of the principal facts of such alleged default and the dates thereof; and that by reason of such failure appellee violated the terms of the bond and the appellant, United States Fidelity & Guaranty Company, was relieved of any liability to it on account of the alleged default on the part of the Noyes Manufacturing Company. That it was also further provided in the bond that the surety should not be liable for any damages resulting on account of labor difficulties; that the failure of the Noyes Manufacturing Company to promptly make deliv-

ery of the machines called for in its contract with appellee, if any default there was, was caused by labor difficulties, which, under the terms of the bond, relieved the surety of any liability therefor.

In a second amended petition, filed by appellee, it was alleged that it obtained, by paying therefor $6,250.00, the castings it was required by its contract with the appellant, Noyes Manufacturing Company, to furnish it for use in the manufacture of the machines, and, without delay, offered to deliver them to the Noyes Manufacturing Company, but that the latter refused to receive them; that by reason of the latter's violation of its contract with appellee the castings were left on appellee's hands and are worthless to it, whereby it was further damaged in the sum of $6,250.00, for which judgment was prayed.

All affirmative matter contained in the answer and counter-claim of the appellant, Noyes Manufacturing Company, and the answer of the appellant, United States Fidelity & Guaranty Company, was controverted by reply. In the reply to the answer of the United States Fidelity & Guaranty Company, it was alleged that the latter, with knowledge of the default of the Noyes Manufacturing Company in the performance of its contract with appellee and of the extension of time for completing the contract, granted it by appellee, and after it had received such knowledge by written notice from appellee of such default, with a statement of the principal facts and dates constituting same, and the purpose of appellee to hold it liable as surety on the bond of the Noyes Manufacturing Company, it made no claim to exemption from liability under the bond or contract by reason of failure to receive notice of the default of the Noyes Company from the appellee, or on account of the extension of time granted the Noyes Company by the latter for completing its contract with it, but on the contrary, continued to hold itself out as being liable to appellee for such damages as it might sustain through the breaching of the contract by the Noyes Manufacturing Company; and, in consideration of an additional premium then or shortly thereafter paid it by that company, it, in writing, extended the indemnity afforded appellee by the bond for another year, by covenanting to continue the bond in force such additional year.

Further responsive pleadings were filed both by appellee and appellants, which did not to any material extent change the issues as made by the pleadings specifically mentioned and commented on. The trial resulted in a verdict in favor of the appellee, as indicated in the beginning of the opinion.

The material grounds urged for a new trial in the court below and now relied on for a reversal of the judgment of that court, are: Error of the trial court, (1) in instructing the jury; (2) in admitting incompetent and excluding competent evidence, and (3) misconduct of appellee's counsel in oral argument to the jury.

The evidence of appellee conduced to prove that the appellant, Noyes Manufacturing Company, violated the contract of August 3, 1911, in the particulars alleged in the petition, as amended; that is, that it failed to manufacture or furnish the tools, dies, jigs and patterns necessary for use in the construction of the insurance vending machines, or to manufacture and deliver the five hundred insurance vending machines even within the extension of time agreed on by the parties; and that neither the one hundred and thirty-two machines actually delivered nor the remainder of the five hundred not delivered would perform, or could be made to perform, the mechanical or automatic functions required by the contract, but were utterly worthless; not because of any fault or defect in the patent or design by which they were to be constructed, but on account of the defectiveness of the material used by the Noyes Manufacturing Company in their construction and the defective and unskillful character of the work of construction.

Appellee's evidence further conduced to prove that its delay in delivering the metal cabinet castings the contract required it to furnish the Noyes Manufacturing Company for use in constructing the frames of the insurance vending machines, did not materially obstruct the manufacture and delivery by the latter of the machines and could not have prevented their delivery within the extension of time fixed by agreement of the parties; and, furthermore, that the extension of time necessarily resulted from the futile efforts of the Noyes Manufacturing Company to remedy the defects in such of the machines as were actually manufactured and delivered by it to appellee. Appellee's evidence also conduced to

prove that the delay in the manufacture and delivery of the machines was fully known to the appellant, United States Fidelity & Guaranty Company, and the extension of time for their manufacture and delivery consented to by it.

The evidence introduced by the appellants on the above issues was contradictory of that of appellee, conducing, in most respects, to support the grounds of defense relied on by them respectively. However, our reading of the great volume of evidence found in the record convinces us that the findings of the jury against the appellant, Noyes Manufacturing Company on the issues between it and appellee, are sustained by the weight of the evidence; nor do we feel authorized, in view of the evidence, to disturb the findings of the jury on the issues between appellee and the appellant, United States Fidelity & Guaranty Company.

It is questionable whether mere delay in deliveries of tools, patterns, etc., or insurance vending machines on the part of the Noyes Manufacturing Company, or in deliveries of castings on the part of appellee, could have constituted default in the meaning of the appellant, United States Fidelity & Guaranty Company's bond, as such delay was manifestly anticipated by the parties and provided against by that clause of the contract allowing appellee, by way of liquidated damages, to deduct ten cents a day, during such delay, from the contract price to be paid for the machines. Anyhow, we think it apparent from the correspondence between appellee and the United States Fidelity & Guaranty Company, appearing in the record, that the latter was fully informed by the former of the delay in deliveries referred to, and the reasons therefor, and that it consented thereto.

Not only is such consent reasonably shown by the correspondence referred to, but it is also established by the fact that the appellant, United States Fidelity & Guaranty Company, after receiving notice of the delay on the part of the Noyes Manufacturing Company in deliveries of tools, dies, jigs, patterns and machines, was paid by it a new or additional premium, for an extension of the indemnity afforded by its bond, and in consideration thereof the United States Fidelity & Guaranty Company continued the bond and its liability thereon another year. This was pleaded by appellee

in an amended reply as a waiver of the special defenses made by its answer, and was not controverted. When the notice was received by the appellant, United States Fidelity & Guaranty Company, it made no claim that the notice had not been given in time or was otherwise insufficient, nor did it then make any claim to exemption from liability on that ground; and when, thereafter, it received from the Noyes Manufacturing Company the additional premium for continuing the bond, and in consideration of which it did continue its liability thereon for another year, it had, according to the evidence, knowledge of the continued delay in deliveries on the part of the Noyes Manufacturing Company and also of the extension of time which had been granted that company by appellee for completing its contract with it.

In United States F. & G. Co. v. Trustees Baptist Church, etc., 31 R., 520, the action was brought upon a bond like that here involved, which had been executed by the United States Fidelity & Guaranty Company (the same corporation sued in this case) as surety for one Reese, and to guarantee his faithful performance of a contract whereby he undertook to make certain repairs and improvements on the church building. Reese failed to comply with his contract and one of the defenses interposed by the surety company to the recovery sought on the bond was that the trustees of the church failed to give it notice of the default of Reese, which the bond required. The provision of the bond requiring the notice is identical in language with that contained in the bond sued on in this case. It was held that the notice to the surety was sufficient, although not given within thirty days of the first failure of the contractor to comply with the contract. In the opinion it is said:

"The contract between Reese and the church was entered into in October, 1904, and Reese had until May 15, 1905, to complete the work. The weather was unsuitable a good portion of the time during the winter months, and Reese did not do much work on the building after January, 1905, although between January, 1905, and April he promised frequently to complete the building within the time specified. Appellees did not definitely know until April, 1905, that he had abandoned the contract; and within thirty days from the time they had knowledge of his abandonment they gave appellant the notice required. There is evidence to the effect that

between April first and May 15th, Reese had ample time to complete the building, although he did not do as much work as he should have done previous to that time. Appellant's contention is that as Reese practically quit work on January 20, that notice should have been given within thirty days from that date, and that the failure to give such notice released it from liability. To this argument we cannot agree, as the church people did not certainly know in January or until April that Reese had abandoned the contract, or was not going to complete it within the time provided, and until the church committee had information sufficient to put a reasonable man upon notice that the contractor had defaulted, they were not remiss in their duty in respect to notifying his surety. Within thirty days after they might reasonably be expected to know that Reese did not intend to comply with his contract, they gave the required notice."

United States F. & G. Co. v. Paxton, 32 R., 707, was an action brought by the sheriff of Anderson county on bonds executed by the United States Fidelity & Guaranty Company, as surety for his deputies, Johnson and Crossfield. The actions were tried together in the lower court and together appealed to this court. The petitions alleged that during the last year of their service the deputies had collected and failed to pay over a considerable sum of money due to the sheriff. Judgments went against the surety in the circuit court for the sums owing by the deputies. On appeal the judgments were assailed solely upon the ground that the appellant surety did not have notice of the delinquencies, as was provided in the bonds executed by it. The provision of the bonds with respect to the notice to be given to the surety, required that it be done in writing and immediately after the delinquency, whether of omission or commission, on the part of the deputies, for which the surety was responsible under the terms of the contract, came to the knowledge of the employer; and that any claim made in respect to the bond should be in writing, addressed to the president of the surety company, immediately after the discovery of any loss for which the company would be responsible under the bond, and within six months after the expiration or cancellation of the bond. It was conceded that the sheriff did not give the notice in writing to the president of the

company at its office in Baltimore, Maryland; nor was there a claim made in writing, addressed to its president, immediately after the discovery of the loss, yet we held that the surety could not escape liability for these reasons, because it had waived the notice. In the opinion it is said:

"What did occur was this: These deputies were not required to settle till the end of the year. Nothing had occurred to indicate that they would not settle when required. But when called upon, they gave first one excuse and then another, but failed to settle. When it became apparent that they were dallying with him, the sheriff gave verbal notice to appellant's local agent at Lawrenceburg, who in turn gave notice to the State agent. He must have notified appellant's head office in Baltimore, for they sent out to Lawrenceburg a special representative to look into the accounts of the deputies. This representative went over the accounts with the deputies and the sheriff, and finally struck a balance showing the indebtedness. For this the sheriff then sued. We hold that the action of the surety company was a waiver of the notice provided in the policy contract. The provision for notice was for its benefit, so that it might promptly act to secure itself against the person for whose delinquency it was called upon to answer. When it had such notice from the obligee as gave it all the information it required, and upon which it acted without complaint, lulling the obligee into a feeling of security on that score, it will not be heard to say at the trial that it did not have the notice called for by the contract. It has waived the notice by its conduct, which is as effectual as a formal waiver in writing." The principle announced in the cases, *supra,* is applicable here.

There was in this case no actual or final default on the part of the Noyes Manufacturing Company until about December 31, 1912. It then for the first time became certainly known to appellee and both the appellants that the 132 machines which had been delivered by the Noyes Manufacturing Company to appellee, as well as the remaining 368 going to make up the 500 required by the contract, which had not been delivered, could not be made to perform the mechanical functions expected and required of them, and were utterly worthless. It is not to be overlooked that the object to be accomplished under the contract was the delivery of the full 500 machines.

The contract being entire, delays in deliveries were mere details in its execution provided against, and, when considered in the light of a reasonable interpretation of the bond, were no "default" in the meaning of the term as used therein. (Elliott on Contracts, section 1544.) Therefore, the failure to deliver any lot of machines on the particular day specified by the contract was a secondary matter, with respect to which the rights of all the parties were fully determined in advance by the terms of the contract itself. On account of loss occasioned to appellee by such mere delays, it was protected by that provision of the contract which gave it the right to retain, out of the purchase price to be received by the Noyes Manufacturing Company for the machines, the ten cents per day for each machine, during the continuance of the delay; and, to hold that delay in the delivery of any single machine or lot of machines, constitutes default in the meaning of the bond, as contended by the surety, would be a too narrow interpretation of its meaning; so technical, indeed, that it would avoid the bond for practically every purpose save the collection of premiums for the indemnity furnished thereby.

It was in the latter part of June, 1912, that the first machines delivered by the Noyes Manufacturing Company to appellee were put to the test and found deficient, and the full character of their deficiencies was not ascertained until July 15th, at which time appellee wrote the United States Fidelity & Guaranty Company, advising it of the facts. This letter set forth the condition of affairs and expressed the hope that the deficiencies were of a character that could be corrected by the contractor, and advised the United States Fidelity & Guaranty Company that the notice contained therein of the deficiencies in the machines was given to provide against all contingencies, and concluded by stating that it was appellee's purpose to give the Noyes Manufacturing Company and its surety full opportunity to carry out the contract and avoid litigation. In addition, the letter asked the surety, in view of this state of affairs, to continue in force its bond. The latter promptly acknowledged the receipt of the letter, stating that it had carefully noted all of its contents; that it would take the matter up with the Noyes Manufacturing Company, and made no complaint whatever of the time, character or contents of the notice. After some further correspond-

ence between appellee and the United States Fidelity &
Guaranty Company, the latter, July 31, 1912, telegraphed
appellee that it would extend the period of its liability
under the bond for another year, viz., to August 8, 1913.

It will thus be seen that the appellant, United States
Fidelity & Guaranty Company, received written notice
of the defective character of the machines first delivered,
also of the delay in their delivery, and of appellee's pur-
pose to permit the Noyes Manufacturing Company to
remedy the defects, if possible, and that it did not object
thereto; furthermore, that when it extended the indem-
nity afforded appellee for another year, in consideration
of the premium paid it by the Noyes Manufacturing
Company, it then knew of later delay on the part of the
Noyes Manufacturing Company in the delivery of other
machines, likewise defective in character, which that
company, with appellee's consent, would be permitted
to perfect, if possible.

The facts thus shown by the correspondence, and the
extension of the surety's liability on the bond, clearly
demonstrate that there was a complete understanding
between all the parties concerned, that the Noyes Man-
ufacturing Company was to be given time and opportu-
nity for carrying out its contract, by correcting recog-
nized deficiencies in the machines and perfecting them,
if possible, in accordance with the terms of the con-
tract.

So thereafter, and down to December 31, 1912, the
Noyes Manufacturing Company continued its efforts to
correct the defects in the machines, and from time to time
made shipments of machines to appellee, which were at-
tempted to be placed in operation, until altogether 132
machines were shipped to appellee. These machines were
kept under constant inspection and attention by expert
mechanics in the field, in appellee's employ, and repairs
and new parts from the factory of the Noyes Manu-
facturing Company were placed upon them from time
to time, but with all the efforts that were made to thus
perfect them, it became manifest on December 31, 1912,
that they could not be made to perform the mechanical
functions required of them. Realizing this, appellee,
about December 31st, wrote the Noyes Manufacturing
Company to the effect that notwithstanding the fair op-
portunity given it to perfect the machines, its failure to
do so made it impossible for appellee to do anything

with the 132 machines delivered it, or with the remaining 368 the contract required the Noyes Manufacturing Company to furnish it; offered to return it the 132 machines, and informed it that it would not accept the remaining 368.

It is shown by the correspondence which followed between appellee and the Noyes Manufacturing Company, extending down to January 14, 1913, that the latter positively refused to receive the 132 machines or place them in repair, and appellee refused to retain the 132 machines or to accept the remaining 368 then in the factory of the Noyes Manufacturing Company at Dayton, Ohio. This correspondence also conclusively shows that the first real breach of the contract and default on the part of the Noyes Manufacturing Company thereunder, occurred between December 31, 1912, and January 14, 1913, notice of which was duly given the United States Fidelity & Guaranty Company by letter of January 15, 1913. In view of the foregoing facts, no ground is apparent for sustaining the defence interposed by the surety in the bond.

It is further manifest from the evidence found in the record that any delay that may have occurred on the part of appellee in the delivery of the cabinet castings the contract required it to furnish the Noyes Manufacturing Company for the frames of the machines, could not have delayed the latter in the manufacture and delivery of the machines. The castings could not be made or furnished by appellee until the Noyes Manufacturing Company provided it with the patterns by which they were to be made, and the delay of the latter in providing appellee with the patterns, as required by the contract, alone caused the delay in the delivery of the castings on the part of appellee.

There is no merit in the United States Fidelity & Guaranty Company's contention that it was released from liability on the bond by changes that were made or attempted to be made by appellee and the Noyes Manufacturing Company in the construction of the machines, as such changes as were contemplated by the contract were adopted in endeavoring to remedy the defects in the machines, and were made with the knowledge and consent of the surety. Besides, it is a well-known rule of law with respect to contracts of this character that changes in plan or construction, which do not in any way affect

the substance of the contract or increase the risk of the surety, should be regarded as in contemplation of the parties. (Mudd v. Shroader, 152 Ky., 696; Cook v. White School District, 111 S. W., 686.) None of the changes here complained of by the surety imposed upon it any additional risk.

The actual loss sustained by appellee from the failure of the appellant Noyes Manufacturing Company to perform its contract, is readily ascertainable. Beginning with the date of the contract, and shortly thereafter, appellee, as required by its terms, paid to the appellant Noyes Manufacturing Company, for the tools, patterns, etc., the contract required it to furnish, $24,085.20; for the machines to be furnished it under the contract by the Noyes Manufacturing Company, $61,250.00; and for the cabinet castings obtained for the use of the Noyes Manufacturing Company in constructing the machines, $6,250.00, making a total of $91,585.20, which was the amount allowed it by the verdict of the jury.

In order that it may be seen whether appellants' complaint of the instructions is authorized, we here insert them in full:

"The court instructs the jury:

"1. That if they shall believe from the evidence that the insurance vending machines manufactured by defendant, Noyes Manufacturing Company, under the contract with plaintiff, of August 3, 1911, were not constructed in a skillful and substantial manner, and free from defects of material or workmanship of any kind, and that by reason thereof said machines would not perform the mechanical functions for which they were designed, that is, automatically stamp the time of day and day of year upon an accident ticket and coupon upon the purchaser thereof standing upon the platform of said machine and depositing therein a five-cent coin, and indicate the approximate weight of said purchaser, and perform said operation in public use for a period of one year after same were inspected and passed upon by an agent of plaintiff and delivered to plaintiff, then the law is for the plaintiff, and the jury should so find as to this item.

"Unless the jury shall further believe from the evidence that the failure, if any, of said machines to perform their mechanical functions, as stated in this instruction, was caused by rough or unfair treatment of said machines or by want of reasonable care of or at-

tention to said machines by persons placed in charge of them by the plaintiff, or the use of policy rolls in said machines not properly prepared for use therein, in which latter event the law is for the defendants as to this item, and the jury should so find.

"2.    But if the jury shall believe from the evidence that the insurance vending machines manufactured by defendant, Noyes Manufacturing Company, under the contract with plaintiff, of August 3, 1911, were constructed in a skillful and substantial manner and free from defects of material or workmanship of any kind and that said machines would perform the mechanical functions for which they were designed, that is, automatically stamp the time of day and day of year upon an accident insurance ticket and coupon upon the purchaser thereof standing upon the platform of said machine and depositing therein a five-cent coin, and indicate the approximate weight of said purchaser, and perform said operation in public use for a period of one year after same were inspected and passed upon by an agent of plaintiff and delivered to plaintiff, then the law is for the defendants as to this item, and the jury should so find.

"3.    If you find for the plaintiff under instruction No. 1, you should find for it in the sum of $67,500.00, the amount paid for the cabinet castings and the machines, deducting therefrom, however, the value, if any, of the 132 machines delivered.

"4.    If you find for the plaintiff under instruction No. 1, you should further find for it as to the delay in the delivery of the machines, unless you should believe that by an agreement between the plaintiff and the defendant, the Noyes Manufacturing Company, the dates of delivery specified in the contract were waived or extended and additional time given the defendant, the Noyes Manufacturing Company, to complete and deliver the machines to plaintiff, in which latter event you should find for the defendants as to this item; but if you find for the plaintiff as to this item, you will find for it in the sum of $18,-650.60, which is the aggregate amount of liquidated damages at ten cents per day for each machine not delivered from the dates of delivery specified in the contract to January 14, 1913, and six months thereafter.

"5.    If the jury believe from the evidence that the defendant, the Noyes Manufacturing Company, did not manufacture and deliver to plaintiff all the tools, dies,

jigs and patterns free from defects of workmanship or material necessary to the complete construction of the insurance vending machines in question, then as to this item the law is for the plaintiff, and the jury should so find in the sum of $24,085.20; but if you further find that said Noyes Manufacturing Company did not manufacture and deliver all, but part, of said tools, dies, jigs and patterns, then you shall credit this amount of $24,085.20 by the amount of the reasonable value of said tools, dies, jigs and patterns so manufactured and delivered; but, if you believe from the evidence that the defendant, the Noyes Manufacturing Company, did manufacture and deliver all of the tools, dies, jigs and patterns mentioned in the contract, then the law is for the defendants as to this item, and the jury should so find.

"6. If you find for the defendants under instruction No. 1, then you will find for the defendant, the Noyes Manufacturing Company, in the sum of $6,253.62 on its counter-claim.

"7. You should show by your verdict your finding as to each of the above items separately, and shall also sum up your findings upon the separate items and show the net result thereof, and if your verdict is for the plaintiff, it shall be against both of the defendants, the Noyes Manufacturing Company and the United States Fidelity & Guaranty Company, jointly and severally, but your total verdict upon all the items, if any, against the defendant, the Noyes Manufacturing Company, shall not exceed the sum of $112,236.80, and if your verdict exceeds the sum of $100,000.00 against the Noyes Manufacturing Company you should give your verdict as against the United States Fidelity & Guaranty Company for the sum of only $100,000.00; but if your verdict against the Noyes Manufacturing Company is less than $100,000.00 then your verdict against the United States Fidelity & Guaranty Company shall be the same, as that against the Noyes Manufacturing Company.

"If you find for the defendants you will find for the defendant, the Noyes Manufacturing Company, in the sum of $6,253.62 on its counter-claim."

Appellants object to instruction No. 3 upon the ground that it permitted the jury, if they found that all the machines were defective, to award the plaintiff $67,500.00, the amount paid for the cabinet castings and the machines, less the value of the 132 machines deliv-

ered; it being insisted that the instruction took from the jury consideration of the value of the 368 machines that were manufactured but not delivered, because of the appellee's refusal to accept them, and that the measure of damages should have been as required by the rule announced in Newton v. Bayless Fruit Co., 155 Ky., 440. In that case the rule is thus stated:

"It is the law that in an entire contract for successive deliveries of goods sold, a vendor's breach in the earlier deliveries, or any of them, may relieve the vendee of liability for subsequent deliveries, if prompt notice of refusal to perform is given by the latter."

It was held, however, that the rule could not be invoked by a purchaser of several carloads of oranges, to be delivered in successive shipments, because after receiving the first car and finding the oranges defective and unmarketable, he not only accepted them, but failed to give prompt or any notice to the vendor that he would, because of their defective and unmarketable character, refuse to receive the further shipments to be made under the contract. Therefore, it was further held that the measure of damages applicable in that case would be the difference, if any, in the price for which the three cars of oranges, if of a marketable or merchantable quality, could have been sold on the market at Winter Garden, Florida, f. o. b. cars, as of the 7th, 8th and 10th of December, 1907, respectively, and the price appellee would have paid for them according to the contract, had they been received by it at Lexington, as provided by the contract.

The measure of damages as given in the case *supra* is not applicable here. It is true there was no election made by the appellee in this case to refuse to perform the contract because of the failure of the first machines delivered to conform to the requirements thereof, as such election was postponed and prevented by the repeated assurances of the Noyes Manufacturing Company, made at the time of each delivery of machines, down to the time the last of the 132 were delivered, that it would be able to remedy the defects apparent therein, so that they would perform the required mechanical functions. Down to that time, and even subsequently, appellee was anxious to accept the entire 500 machines, provided they could be made by the Noyes Manufacturing Company to conform to the requirements of the contract, but when it was

definitely ascertained, after there had been a delivery of 132 of them, that the Noyes Manufacturing Company could not so remedy the defects in all or any of the 500 machines as to make them perform the mechanical work required, and that all of them were worthless, nothing more could be done by either of the parties to consummate the contract; hence appellee's legal remedy was to refuse to accept the remaining 368 undelivered machines and demand of the Noyes Manufacturing Company that it take back the 132 worthless machines which had been delivered, and this was the course pursued by it. If, therefore, the 132 machines which had been delivered and the 368 which had not been delivered were all defective and equally worthless, appellee, saying nothing of the damages that it may have sustained by way of loss of profits on the machines if they had performed according to the contract the mechanical functions required of them, was certainly, and in any event, entitled to recover what it had paid for the machines, cabinets, tools, patterns, etc., which amounted altogether to the sum awarded it by the verdict of the jury.

The instruction as to the measure of damages substantially gave the appellants what they asked in instruction "F," offered by them, as it allowed the jury to deduct from whatever amount they might find for the appellee the value, if any, of the machines delivered. In view of the admitted fact that the 368 undelivered machines were as defective in character as the 132 delivered, and the great weight of the evidence to the effect that the entire 500 were worthless, as were the tools, dies, patterns and castings used and intended for further use in their manufacture, we are unable to say that instruction No. 3 was prejudicial to any substantial right of the appellants.

What we have said in passing on appellants' objection to instruction No. 3 also disposes of their objection to instruction No. 5.

It is further insisted for appellants that instruction No. 7 is erroneous in that it required the jury, if they found a verdict against the Noyes Manufacturing Company as principal, to also find a verdict, not exceeding $100,000.00, against the appellant United States Fidelity & Guaranty Company, as surety. The contention is without merit. On the pleadings and proof, the only defense that could have been made by the appellant United States Fidelity & Guaranty Company was that inter-

posed by its principal, the Noyes Manufacturing Company.. This is, so because, as previously stated in the opinion, the waiver pleaded in the amended reply of appellee, as arising out of its continuing its bond in force for another year after receiving notice of its principal's defaults, stands uncontroverted by anything appearing. in the record; and it is, doubtless, for this reason that the appellant United States Fidelity & Guaranty Company. has made no complaint on this appeal of the ruling of the trial court in refusing the peremptory instruction asked by it at the conclusion of the appellee's evidence.

While the instructions given on the trial might be improved in some of their phraseology, considered as a whole, they are substantially correct; and as, in our opinion, they contained all the law necessary to the proper guidance of the jury in arriving at a verdict, there was no error in the refusal by the trial court of the instructions offered by appellants, although one or more of them, with a few verbal corrections, might have been properly given.

The alleged misconduct of appellee's counsel consisted of the following statement made by him in argument to the jury:

"Jake Oswald is a director of the National Cash Register Company, and he is the only director in that company who is not today under indictment and a jail sentence. The National Cash Register Company has come to the assistance of the defendants in this case on account of Jake Oswald."

The Jake Oswald referred to by counsel is the vice president and general manager of the appellant Noyes Manufacturing Company, and had testified in the case for the appellants. It is stated in the bill of exceptions (page 322, Record) that "the defendants objected to the statement of plaintiff's counsel as misconduct and moved that the court discharge the jury, to which the plaintiff objected and the court sustained said objection and refused to discharge the jury, to which the defendants and each of them accepted."

At page 342 of the record we find in the bill of exceptions, as corrected, this additional statement with respect to the alleged misconduct of appellee's counsel referred to:

"When, during the closing argument to the jury by plaintiff's counsel, the defendants objected to the remarks of plaintiff's counsel as set out in the bill of ex-

ceptions, the court sustained the objection and admonished the jury not to consider such statements, but the court did not reprimand plaintiff's counsel in the presence of the jury. J. A. Oswald is not, and was not at any time during the progress of this suit, a director in the National Cash Register Company."

The above addition tó the bill of exceptions followed the filing of á joint affidavit made by David R. Castleman, the counsel complained of, George A. Kirchner and William B. Thomas, which contains the following statements with respect to the matter under consideration:

"Concerning the objection to the argument of plaintiff's counsel referred to in defendant's bill, it is impossible to recall the exact words used by said counsel, David R. Castleman, in referring to the conviction by the Federal Government of the directors of the National Cash Register Company, but it is certain that he selected from among those directors J. A. or 'Jake' Oswald and emphasized the fact that Oswald had no connection with said prosecution and he was the only witness in this case who had ever at any time been a director of the National Cash Register Company. Furthermore, said reference was made by said counsel in response to various statements made by defendants' counsel, Mr. Helm Bruce, in his argument of the case, he having dwelt at great length during his argument of two hours and a half in high praise of the Register Company and its fame and reputation. It is furthermore certain that as soon as plaintiff's counsel had made said reference defendant's counsel objected to same and the court promptly sustained said objection, admonishing the jury not to consider the statements, and reprimanded plaintiff's counsel, Castleman, in the presence of the jury for making said comments and told the jury that it had no bearing on the case and must not be considered by them. Defendant's counsel took no further notice of the matter immediately, and plaintiff's counsel had started into a discussion of other features of the case, and defendants' counsel had resumed his seat and the matter was apparently at an end before defendants' counsel again broached the subject and moved the court to discharge the jury. This motion the court overruled, to which defendants excepted."

The above affidavit was, by order of the court, made a part of the bill of exceptions and of the record.

It will be observed that the bill of exceptions as first prepared and filed, omitted the important statement that the trial court sustained appellants' objection, admonished the jury not to consider the statement, and reprimanded counsel. The additional order, later entered, corrects the statement referred to, to the extent of showing that the court admonished the jury not to consider the statements of counsel referred to, but fails to recite that the counsel was reprimanded by the court in the presence of the jury, as shown by the joint affidavit of Castleman, Kirchner, and Thomas.

The statement made by counsel complained of was highly improper and should not have been indulged in, but in view of the action of the court in admonishing the jury not to consider what had been said by counsel, and its further action in reprimanding counsel in the presence of the jury for indulging therein, we are unwilling to say that the effect of the counsel's misconduct was so prejudicial to the appellant's rights as to have authorized the trial court to end the trial by discharging the jury. In other words, we think the wrong done by counsel was remedied by the action taken by the court. As said in P. C. C. & St. L. R. Co. v. Lewis, 18 R., 957:

"If the jury is to be discharged of the case upon every improper remark of counsel, few trials could be finished. Ordinarily, the good sense and sound discretion of the jury can be relied on to prevent injustice by reason of the incompetent statements of counsel, especially where the court directs that such statements are to be disregarded. (L. & N. v. Coyne, 17 Ky. Law Rep., 285; State v. Rivers, 90 N. C., 738.)"

The propriety of the rule stated in the opinion *supra* is approved in the following cases: Lou. Ry. Co. v. Sweeney, 157 Ky., 620; Cont. Coal Corp. v. Cole, 155 Ky., 139; I. C. R. R. Co. v. Colly, 27 R., 730; C., N. O. & T. P. R. Co. v. Spears, 152 Ky., 200; Evan Chemical Co. v. Ball, 159 Ky., 399; Belle of Nelson v. Riggs, 20 R., 499; Frazier v. Malcolm, 22 R., 1867; L. & N. R. R. Co. v. Morgan, 110 Ky., 740; Sandy Valley R. Co. v. Bentley, 161 Ky., 555.

With respect to appellants' remaining complaint, as to the rulings of the trial court in admitting and rejecting evidence, it is to be remarked that: where, as shown by the record before us, ten days were consumed in the trial of the case and as many as fifty wit-

nesses testified, it would be strange indeed if no error were found in the many rulings required of the trial judge in the matter of admitting or rejecting evidence. If, however, such errors as are disclosed by the record are not prejudicial to the substantial rights of the party complaining of them, they afford no ground for reversal, and, on appeal, should be disregarded. Without discussing in detail the rulings of the circuit court as to the matters of evidence here complained of, we deem it sufficient to say we do not find them as numerous or of the gravity asserted by counsel for appellants. It cannot be said that any of them were so prejudicial to the substantial rights of the appellants as to have prevented them from receiving a fair trial.

It being our conclusion that no sufficient cause has been shown in this case for the reversal sought, the judgment is affirmed.

Whole court sitting.